

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Nov 10, 2025

IN RE:

**RUSTY WILLIAMS MCMURRAY,**

**Debtor.**

**Case No. 24-10777-T
Chapter 7**

## MEMORANDUM OPINION

THIS MATTER comes before the Court pursuant to Objections to Proofs of Claim Numbers 12, 13, and 14 (the "Objections"),[1] filed by Rusty McMurray ("Debtor"), and the Responses thereto[2] filed by Thomas J. Marti ("Marti"), Kevin Turner ("Turner"), and Page Cole ("Cole") (collectively, the "Claimants"). The Court held a hearing in this contested matter on August 6, 2025 (the "Hearing"), after which the Court took the Objections under advisement. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52, made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014.

### Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b).[3] Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C. § 157(a). Matters concerning allowance or disallowance of claims against the estate are core proceedings under 28 U.S.C. § 157(b)(2)(B).

---

[1] ECF Nos. 54, 55 & 56.
[2] ECF Nos. 59, 60 & 61.
[3] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

## Findings of Fact

Debtor is an individual. He is the CEO and a shareholder of Sunshine Care Partners, Inc. ("Sunshine"), an Oklahoma corporation incorporated by Debtor in 2015. Debtor became acquainted with each of the Claimants in the succeeding years as they expressed interest in licensing from, working with, or investing in the business of Sunshine.  Eventually, each of the Claimants became shareholders of Sunshine and members of its Board of Directors (the "Board"). In the summer of 2020, Debtor and his son, Forrest McMurray ("Forrest"), as majority shareholders of Sunshine, acted to remove the Claimants from the Board.[4] In July 2020, Debtor, as CEO and President, directed Sunshine to file a state court action in the District Court of Tulsa County, Oklahoma against each of the Claimants seeking declaratory relief, injunctions, and damages (the "State Court Action").[5] Sunshine's claims against Claimants in the State Court Action were dismissed in October 2023.[6]

On June 20, 2024, Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code. Debtor did not schedule the Claimants as creditors. On November 11, 2024, after learning of Debtor's bankruptcy case, Claimants filed a motion to extend the deadline to file claims. Debtor objected to that motion on the basis that Claimants do not hold any claims against him or his estate. On January 21, 2025, the Court granted Claimants an extension of time to file claims in this case, but made no findings as to whether they were in fact creditors, leaving the matter for resolution at the claims objection stage.[7]

---

[4] Claimants' Ex. 9-15, 9-25.

[5] District Court of Tulsa County, Tulsa, Oklahoma, Case No. CJ-2020-2181; Claimants' Ex. 8.

[6] It appears the State Court Action lives on through counterclaims and the addition of third-party defendants, although no evidence of that was presented to the Court.

[7] *See* ECF No. 73 at 6 (Transcript of January 21, 2025, hearing).

Claimants subsequently filed individual proofs of claim as follows:

a)      Marti, Claim #12, for $1,485,673.80;[8]

b)      Turner, Claim #13, for $1,485,673.80;[9]

c)      Cole, Claim #14, for $1,564,282.85;[10]

(collectively, the "Contested Claims"). The basis of each claim is listed as "Breaches as officer, director, shareholder and control person."[11] Debtor has objected to the Contested Claims on the grounds that Claimants are not creditors in this bankruptcy case. Attached to each of the Contested Claims is a single page document (the "Attachments").[12]  Under the word "Principal" is a list that includes the following information:

1.  "Lost expense on territory agreement" $78,579.05 (claims of Marti & Cole only);

2.  "Wrongful removal and suit (fees and cost)" $107,402.50, with a notation that this portion of the claim is shared among Claimants;

3.  "Unpaid, undisclosed distributions," amount listed as "to be determined;" and

4.  "Debt incurred in name of Sunshine Care Partners" $1,378,271.30, followed by a list of five business entities with corresponding dollar amounts, and notations suggesting that two of the entities have filed claims in this case.

There is no other documentation attached to the Contested Claims.

At the Hearing, the Court received the following exhibits from Claimants:

1.  a) "Ownership Stock Sale," documenting sale by Debtor of 25%, or 250,000 shares, of his personal interest in Sunshine Care Medical Group to Cole for $25,000, dated August 27, 2019; b) "Ownership Stock Sale," describing sale by Sunshine of 207,500 shares to Cole for $100,000 in two separate tranches, unsigned, dated December 16, 2019.

---

[8] ECF No. 12-1.
[9] ECF No. 13-1.
[10] ECF No. 14-1.
[11] *See, e.g.*, ECF No. 12-1 at 2.
[12] ECF Nos. 12-1 pt. 2; 13-1 pt. 2; 14-1 pt. 2.

2.  a) Check from Cole to Sunshine for $50,000, dated August 27, 2019; b) Check from Cole to Debtor and his wife for $25,000, dated August 27, 2019, related to the purchase of stock in Sunshine Care Medical Group evidenced at Claimants' Ex. 1-1; c) Withdrawal slip from Cole for $50,000, dated December 17, 2019.

3.  "Agreement," between Sunshine and Cole, giving Cole 1% ownership, or 40,000 shares, in exchange for a $50,000 Promissory Note and a promise by Sunshine to repay the note, unsigned, dated August 27, 2019.

4.  Spreadsheet titled "Sunshine, Cole Franchise Work Timesheet," showing total of 142.25 hours, dated August 7, 2019, to March 19, 2020.

5.  Territory License Agreement of Sunshine for Dallas County and Tarrant County, Texas. Executed by Debtor as President of Sunshine, as Licensor, and Cole as President of ShepCole, Inc., as Territory Licensee, dated February 4, 2020. The agreement gives Territory Licensee an exclusive license to operate in the defined territory in exchange for $77,526 plus royalties, defined as 10% of gross revenues collected from services under the agreement. The agreement also obligates Licensor to provide some training.

6.  Spreadsheet titled "Expense Sheet for Dallas Ft Worth Franchise Territory of" Sunshine. Shows expenses totaling $9,053.05, plus $77,526.00 for "Purchase of Dallas and Tarrant County Territory," dated January 28, 2020, to January 25, 2022.

7.  Emails between Bill Turner and Cole regarding a request from Debtor to increase Debtor's pay from $1,500 to $2,500 per two-week pay period, dated April 15-22, 2020.

8.  Petition, filed in State Court Action on July 14, 2020. The caption names Sunshine as Plaintiff versus Turner, Cole, and Marti as Defendants. The claims for relief included declaratory judgment regarding removal of Claimants from Board, breach of fiduciary duty, and requests for injunctions and damages.

9.  Amended Petition, filed in State Court Action on February 1, 2021. The caption names Sunshine as Plaintiff versus Turner, Cole, and Marti as Defendants. The claims for relief were amended to include: declaratory judgment regarding removal of Claimants from Board, breach of fiduciary duty, tortious interference with business relations, civil conspiracy to tortiously interfere with business relations, and requests for injunctions and damages.

10. Letter from Stephen R. Clouser to Alexander King, Kingswood PLLC, regarding Shareholders' Demand for Annual Meeting, directed to Sunshine and Debtor, among others, by Claimants, as shareholders of Sunshine, dated July 19, 2022.

11. Spreadsheet documenting Cole's legal expenses, totaling $56,898.54, from September 3, 2020, to July 8, 2025.

12. Offer letter from Sunshine to Turner for position of Chief Operating Officer, dated September 7, 2019. The letter describes Debtor as Chief Executive Officer. The letter is executed by Debtor (with no description of title), and accepted by Turner.

13. Letter modifying employment terms between Sunshine and Turner, dated February 26, 2020. Executed by Debtor (with no description of title), and Turner.

14. Articles of Incorporation for Sunshine Care Partners of Florida, Inc. ("Sunshine Florida"), filed with the Florida Secretary of State, dated September 15, 2023. Lists Debtor's mailing address as mailing address of Sunshine Florida; Debtor as incorporator; and Debtor as an initial officer or director of Sunshine Florida, with title "VP."

15. Schedule of shares earned by Turner from Sunshine under his employment agreement. Shows Turner earned 27,673.12 shares between May 1, 2019, and May 8, 2020,

representing a percentage ownership of Sunshine ranging from 0.99% to 3.004% over that period (description of exhibit provided by testimony of Turner).

16. List of checks paid by Turner to Savage O'Donnell totaling $13,718.82, for legal fees, dated January 1, 2022, to June 2, 2024. (description of exhibit provided by testimony of Turner).

17. Bylaws of Sunshine. Executed by Debtor, as President and Secretary, dated January 6, 2016.

18. Response of Sunshine to Defendant's Requests for Production of Documents, captioned in the State Court Action.  Certificate of Service dated September 3, 2022.

19. Emails between Cole and Debtor, dated April 23, 2020, to April 28, 2020.

20. Letter to "All Employees of" Sunshine, undated. Letter informs employees of recent changes to Board of Sunshine; importance of routing correspondence through Debtor; importance of not answering requests from outside of Sunshine. (description of exhibit provided by testimony of Bill Turner, author of letter).

21. a) Blank Sunshine Territory License Agreement; b) Agreement in Principle ("AIP") between Sunshine, Marti, and Brad Whitmas dba FirstCare Partners, executed by Debtor as President & CEO of Sunshine; Marti and Whitmas as individuals, dated October 26, 2016.  Terms of the AIP include the sale of Tulsa County and Grand Lake NE Oklahoma territory licenses; 50% ownership in software business; 34.9% ownership in Sunshine and a Board position; compensation of outside consultant at $1,250/ week plus 5% profit.

22. Response of Sunshine to Defendant's Requests for Admission, captioned in State Court Action. Certificate of Service dated September 3, 2022.

23. "Detail Payment Transaction File List," Savage O'Donnell Affeldt & Weintraub.  Record of payments made to law firm related to Sunshine litigation, totaling $107,402,59, between September 4, 2020, and January 17, 2025.

24. Invoice from Debtor, as individual, to First Care Partners c/o Marti. Single payment of $1,000 under independent contractor agreement at rate of $1,250/week, dated November 8, 2016.

25. Bank statements of First Care Partners LLC, dated November 30, 2016, to April 30, 2018.

26. Unanimous Consent of Owners of Sunshine, dated May 24, 2017. Adopts resolutions to transfer 34.9% of outstanding shares of Sunshine to Marti. Executed by Debtor and Timothy Houchin ("Houchin") as shareholders of Sunshine.

27. Majority Consent of Shareholders of Sunshine, dated August 23, 2017.  Adopts resolution to authorize changes to First Care Partners sublicense agreement from renewable to perpetual. Attachment shows ownership interest of Sunshine: Debtor 50.1%, Forrest 10%, Marti 39.9%.

28. a) Purchase Agreement, between Marti, as buyer, and Houchin, as seller, dated July 10, 2017. Marti purchased all Houchin's shares of Sunshine, which was 5% of Sunshine's outstanding shares, for $15,000. The Purchase Agreement obligated Houchin, as seller, to deliver share certificates or other documents as evidence of the transfer. Executed by Marti and Houchin, as individuals; b) Unanimous Consent of Owners of Sunshine, dated July 10, 2017, adopting resolution that attachment shows ownership interest of Sunshine: Debtor 50.1%; Forrest 10%, Marti 34.9%, Houchin, 5%.

At the Hearing, Debtor testified that the purpose and business of Sunshine was a software package and brand to assist doctors in implementing medical programs related to chronic care of patients. Upon its incorporation, Debtor directed that the Bylaws of Sunshine be drafted to protect himself as the majority shareholder.  As of May 2017, Debtor and Houchin, an attorney, were the only shareholders of Sunshine.[13] Neither Debtor nor Houchin contributed cash to Sunshine, but instead received their shares in exchange for services rendered to the corporation.

### a.  *Claim No. 12: Marti*

Marti is a pharmacist that was introduced to Debtor for the purpose of discussing a business opportunity.  In October 2016, Marti, doing business as First Care Partners LLC ("First Care"), purchased a territory license from Sunshine for Tulsa County and Grand Lake NE Oklahoma territories.[14] In Marti's telling, there was no business or brand of Sunshine until he and First Care built the entire business from scratch. Marti testified that he invested approximately $610,000 into his territory and building the business of Sunshine. In exchange, he received 34.9% ownership in Sunshine in the form of stock.  The funds Marti contributed were used for payroll, marketers, and sales personnel. Consistent with the AIP, Debtor performed work in July and August 2017 for First Care to assist with development of its markets and was paid as an independent contractor at the rate of $1,250.00/week plus royalties of 5% of revenues.[15] In that role, Debtor assisted First Care in hiring staff, training staff, and building an outreach team. Compensation for those services is reflected in checks from First Care to Debtor.[16] Marti testified that he and/or First Care were supposed to receive 5% of the revenues of Sunshine, but neither of them ever received those funds.

---

[13] Claimants' Ex. 26.
[14] Claimants' Ex. 21.
[15] *Id*. at 21-19.
[16] Claimants' Ex. 25-37 & 25-41

On July 10, 2017, Marti purchased an additional 5% ownership in Sunshine from Houchin for $15,000, bringing Marti's total ownership to 39.9%. The purchase agreement with Houchin obligated Houchin to provide stock certificates to Marti as part of the transaction, but those were never provided.  Marti testified that his share of the legal expenses incurred by Claimants related to the State Court Action is roughly $50,000.

### b. Claim No. 13: Turner

Turner began his relationship with Sunshine by acquiring a promissory note for $25,000. Instead of collecting the note, he surrendered the note to Sunshine for 25,000 shares of its stock. Turner acquired additional shares as part of an employment compensation package at the rate of 1,923.08 shares on a bi-weekly basis while he was Chief Operating Officer of Sunshine.[17] Between May 1, 2019, and May 8, 2020, Turner accumulated 27,673.12 shares as part of his compensation package.[18] Turner testified that he currently owns roughly 405,000 shares of Sunshine stock.

Turner testified that during his time as an employee of Sunshine, he observed Debtor making decisions regarding workflow, financial matters, and compensation of employees for the company. Turner testified that after he was directed to sell a territory for Los Angeles, he observed that Debtor made decisions regarding compensation and bonuses of employees for that territory. He also believed that Sunshine made payments for a car belonging to Debtor.  Turner testified that he has paid $13,718.82 in legal fees related to the State Court Action.[19]

---

[17] Claimants' Exs. 12 & 13.
[18] Claimants' Ex. 15.
[19] *See* Claimants' Ex. 16.

### c.  Claim No. 14: Cole

In mid and late 2019, Cole purchased 207,500 shares of Sunshine stock in exchange for two payments of $50,000 each to Sunshine.[20] He also purchased 25% of Debtor's ownership interest, or 250,000 shares, in an entity called Sunshine Care Medical Group.[21] Between August 7, 2019, and March 19, 2020, Cole spent 142.5 hours working to develop Sunshine into a national franchise.[22] For this work, he received an additional 10,000 shares in Sunshine.

Cole incurred expenses of $9,053.05 to open a territory franchise of Sunshine, plus the $77,526 purchase price of the Sunshine franchise.[23] He testified that his territory never operated due to breaches by Sunshine under the territory agreement, including failure to provide adequate start-up and ongoing training.[24] In June 2020, Cole was cut off from training resources and all contact with Sunshine staff, and he was told to make all further contact though counsel. Cole presented a spreadsheet of legal expenses related to the State Court Action he incurred between September 3, 2020, and July 8, 2025, totaling $56,898.54.[25]

### d.  All Claimants

Under questioning from Debtor's counsel at the Hearing, none of the Claimants seemed to understand the nature or basis of the Contested Claims. Each Claimant testified that the debts listed as "Debt incurred in name of Sunshine Care Partners" on the Attachments were not directly owed to them. None of the Claimants could explain whether or how any debt owed by Sunshine translated into a direct claim against Debtor. Claimants stated that the debts were included on the

---

[20] The first $50,000 began as a promissory note that was later voided in exchange for shares in Sunshine.  *See* Claimants' Exs. 1-2, 2-1, 2-3 & 3.
[21] Claimants' Exs. 1-1, 2-2.
[22] Claimants' Ex. 4.
[23] Claimants' Ex. 6.
[24] Claimants' Ex. 5.
[25] Claimants' Ex. 11.

Attachments because Debtor had listed them on his bankruptcy schedules.[26]  Claimants believe that any debt incurred in the name of Sunshine would result in a reduction of the value of Sunshine, and therefore a reduction in the value of their shares. Each Claimant testified that he was unable to calculate the exact amount of his damages because he had not been provided any financial information from Sunshine.

Claimants never received any stock certificates, dividends, or distributions based on their ownership of Sunshine. Each Claimant testified that Debtor controlled the operational and financial decisions of Sunshine, including those regarding compensation of employees.  After the State Court Action was filed, none of the Claimants received any further notice of shareholder meetings, notice of Board meetings, written notification of stockholder actions, written notification of Board actions, notice of cessation of operations of Sunshine, or notice of disposition of Sunshine's assets upon cessation of operations. In July 2022, Claimants sent a shareholders' demand for annual meeting to Sunshine to the attention of Alexander F. King.[27] Debtor testified that neither he nor Sunshine were ever notified of the demand, and that Mr. King did not represent himself or Sunshine in the State Court Action. In the State Court Action, Sunshine filed a response to a request for production of documents filed by Claimants, but no documents were ever produced.[28] Sunshine also filed a response to a request for admission in the State Court Action, in which Sunshine stated that it had held all required annual meetings, but Claimants were denied notice and access to those meetings.[29]

---

[26] Each of the debts listed on the Attachments appear on Debtor's Schedule D and are described as "Commercial/Business Debt."  ECF No. 1 at 24 (Schedule F).  With the exception of the debt to CMG Tulsa Radio, Sunshine is listed as a co-debtor on each of the debts.  *See* ECF No. 1 at 31 (Schedule H).

[27] Claimants' Ex. 10.

[28] Claimants' Ex. 18.

[29] Claimants' Ex. 22-7.

### e.   Additional evidence

Claimants introduced the testimony of Bill Turner, who was employed as the Chief People Officer of Sunshine. Bill Turner testified that he processed a pay increase for Debtor of $1,000 per pay period, at Debtor's request.[30] On or about July 9, 2020, at the request of Debtor, Bill Turner prepared a memo distributed to employees of Sunshine, which "reiterated the importance of not sharing proprietary and intellectual information with anyone other than employees in normal day-to-day business operation," was a "reminder" to keep such information confidential, and instructed employees that if they received a request for information from outside the organization, such request should be directed to Debtor.[31]  Debtor told Bill Turner that such actions were in the best interest of protecting Sunshine, and that it was important that he (Bill Turner) not discuss matters with shareholders or Board members. Debtor expressed to Bill Turner his hope that litigation would exhaust the resources of Claimants sufficiently to inspire a settlement agreement, with the goal that they would surrender of their shares in Sunshine.

Houchin testified that he entered an appearance as counsel for Sunshine in the State Court Action at the behest of Debtor.  In that capacity, Houchin filed an answer to third-party claims against Sunshine brought by Claimants. Houchin testified that he is not being paid for his representation of Sunshine, but believes he is required by ethics rules to provide Sunshine a defense in the State Court Action. Despite repeated assertions from counsel for Claimants, there was no evidence presented, nor did Houchin suggest, that Debtor has ever been a party to the State Court Action.

---

[30] Claimants' Ex. 7.

[31] *See* Claimants' Ex. 20.

## Conclusions of Law

*A.   Allowance of claims and burdens of proof.*

Section 502(a) of the Bankruptcy Code provides that a claim is deemed allowed unless objected to by a party in interest.[32] Once an objection to a claim has been made, § 502(b) provides that the court must determine the amount of such claim and allow it unless it falls into one of nine enumerated exceptions, including that the "claim is unenforceable against the debtor and property of the debtor[.]"[33] Federal Rule of Bankruptcy Procedure 3001 sets out the requirements for a proof of claim:

i.   A proof of claim must be in writing and substantially conform to Form 410.[34]

ii.  If a claim is based on a writing (like a contract or a court judgment), the creditor must file a copy of that writing with the proof of claim. If the writing has been lost or destroyed, a statement explaining the loss or destruction must be filed with the claim.[35]

iii. If the debtor is an individual, the creditor must file an itemized statement of the principal amount of the claim and any interest, fees, expenses, or other charges incurred before the petition was filed.[36]

iv.  If a proof of claim is signed and filed in accordance with the prevailing Bankruptcy Rules, it will be deemed prima facie evidence of the claim's validity and amount.[37]

---

[32] § 502(a).
[33] § 502(b)(1).
[34] Rule 3001(a).
[35] Rule 3001(c)(1).
[36] Rule 3001(c)(2)(A).
[37] Rule 3001(f).

An obvious corollary to the above is that a proof of claim not "signed and filed in accordance with these rules" will not serve as prima facie evidence of the validity and amount of a claim.[38] This includes the failure to attach required supporting documents (or a summary of voluminous documents) if the claim is based on a writing, or an itemized statement of the claim if the debtor is an individual.[39]  Further, a claim is not entitled to prima facie effect if it does not assert a claim against the debtor, including any necessary supporting documentation.[40]  In that case, a claimant has "the initial burden of proving that a claim exists and the amount of that claim."[41] Failure to do so will result in the disallowance of the claim.[42] Only if a claimant is successful in establishing that a claim exists in a particular amount will the burden shift to the objecting party to attack the validity and/or amount of the claim.[43] If the objecting party meets its burden, the claimant has the ultimate burden of proof as to the allowance its claim.[44]

     B. *Claimants failed to file the Contested Claims in accordance with the prevailing Bankruptcy Rules.*

In response to Question 8 of Official Form 410, each of the Contested Claims states its basis as "Breaches as officer, director, shareholder and control person."[45]  The form instructs claimants to "Attach redacted copies of any documents supporting the claim required by

---

[38] *In re Broadband Wireless Int'l Corp.*, 295 B.R. 140, 145 (10th Cir. BAP 2003) (citing Rule 3001(f)).

[39] *See In re Aerospace Engr. & Support, Inc.*, 662 B.R. 168, 178 (Bankr. D. Utah 2024) (citing *In re Broadband Wireless*, 295 B.R. at 146).

[40] *In re Broadband Wireless*, 295 B.R. at 146.

[41] *Id*. at 145.

[42] *Id.*

[43] *In re Aerospace Engr.*, 662 B.R. at 179.

[44] *Id.*

[45] *See, e.g.,* Claim No. 12-1 at 2 (Question 8).

Bankruptcy Rule 3001(c)."[46] The Attachments to each Contested Claim are a single page with the following entries, which the Court will address in detail:

1. The Contested Claims of Marti and Cole refer to "Lost Expense on territory agreement."[47]  To the extent Claimants assert their claims are based on a written agreement, it is not attached as required by Rule 3001(c)(1).

2. Each of the Contested Claims refer to "Wrongful removal and suit (fees and cost)." There is no suit identified. Nor, to the extent Claimants seek "fees and costs," do they provide "an itemized statement of the principal amount and any interest, fees, expenses, or other charges incurred before the petition was filed," as required by Rule 3001(c)(2), where the debtor is an individual.

3. Each of the Contested Claims refer to "Unpaid, undisclosed distributions" in an undetermined amount.  No reference is made to the source or nature of such distributions, or how those are owed to the Claimants by the Debtor.

4. Each of the Contested Claims lists five debts as being "Debt incurred in name of Sunshine Care Partners."  There is no indication how such debts relate to Debtor or Claimants, except a notation that creditors for two of the listed debts have filed claims against Debtor in this case.

Debtor filed an Objection to each of the Contested Claims on the basis that Claimants do not state any claims against Debtor, and that they have failed to attach any writings to support their claims as required under Rule 3001(c). The Court must agree. The Court finds that the Contested Claims and their Attachments are woefully inadequate to meet even the most lenient standards of documentation needed to support a claim. If the Contested Claims are meant to suggest Debtor owes duties to a corporate entity, neither the entity, nor the Claimants' relationship to the entity, nor the source of Debtor's duties are identified, such as written contracts or corporate bylaws as required by Rule 3001(c). The Attachments refer to territory agreements, lawsuits, and legal fees, but provide no documentation, contracts, case numbers, or copies of legal proceedings, from which the Court can make any connection between the Claimants and the Debtor. The Attachments refer

---

[46] *Id*.
[47] *See* Claim Nos. 12-1 pt. 2, 14-1 pt. 2.

to distributions being owed to Claimants, but not how or why Debtor, as an individual, would owe them distributions. Lastly, each Attachment lists a series of debts "incurred in name of Sunshine Care Partners," but no indication of how those debts relate to Debtor or Claimants. The Contested Claims do not indicate that supportive documents are either unavailable or too voluminous to attach.

   *C. The Contested Claims are not entitled to prima facie evidentiary status under Bankruptcy Rule 3001(f).*

The Contested Claims, as filed, do not establish any claims against Debtor. They are completely devoid of any of the required documentation to support claims against any party. The Court finds the Contested Claims are not entitled to a finding of prima facie evidence under Rule 3001(f). Therefore, the burden of coming forward with evidence of the validity and amount of their claims against Debtor's estate lies with Claimants in the same manner as if they were suing Debtor in a non-bankruptcy forum.[48] Although Claimants did not articulate the specific state law basis for the Contested Claims, given that each of the Claimants and Debtor are residents of Oklahoma,[49] Sunshine is incorporated in Oklahoma, and all of their interactions appear to have occurred in Oklahoma, the Court will apply Oklahoma law to the Contested Claims.[50]

The Contested Claims presented in this case are similar to the proofs of claim considered by the court in *In re Broadband Wireless International Corp.*[51] There, the court noted that on the

---

[48] *In re Kendall*, 380 B.R. 37, 46 n.7 (Bankr. N.D. Okla. 2007) ("Except where bankruptcy law dictates a different result, claims resolution carries the same burdens of proof and persuasion 'had the proceedings taken place outside of bankruptcy.'" (quoting *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 19–20 (2000))).

[49] *See* Claimants' Ex. 9-1; ECF No. 1.

[50] *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 20 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. The 'basic federal rule' in bankruptcy is that state law governs the substance of claims[.]" (citations omitted))

[51] 295 B.R. 140 (10th Cir. BAP 2003).

face of the proof of claim, which appeared to assert claims against a non-debtor entity, there did not appear to be any claim asserted against the debtor at all.[52] It also noted that failure to attach copies of contracts or loan documents that served as the basis for the claim was a violation of Rule 3001(c). The court found such a claim was not entitled to be treated as prima facie evidence of validity or amount under Rule 3001(f), and that the claimant had the initial burden to prove his claim.[53]

### D. Claimants failed to establish the validity and amount of their debts.

After hearing the evidence and argument presented by Claimants at the Hearing, the Court remains perplexed regarding the nature and amount of the claims lodged against Debtor. As far as the Court can determine, the basis of the Contested Claims appears to be: 1) Recovery of funds invested in Sunshine, whether to acquire shares, territory licenses, or expenses; 2) Recovery of legal fees incurred in the State Court Action; 3) Recovery of owed, but unpaid, distributions from Sunshine; and 4) Recovery for the loss in value of Claimants' shares in Sunshine, as measured by certain debts it incurred, on the theory that the debts diminished Sunshine's value and therefore the value of their shares. Each of these allegations appears to state claims against Sunshine, but not directly against Debtor. In order to overcome that impediment, Claimants seek to pierce the corporate veil of Sunshine, treat it as the alter ego of Debtor, and thereby hold him personally liable for its debts owed to themselves and others.

### 1. Alter ego theory of liability

---

[52] *Id.* at 146 ("Although it is set forth on Official Form 10, it is executed by Wilson and it was filed, the face of the POC does not assert any claim against the debtor.").

[53] *Id.*

Under Oklahoma law, corporations are regarded as legal entities "separate and distinct from the individuals comprising [them]."[54] When a court ignores this distinction, it is known as "piercing the corporate veil."[55] Under certain circumstances, the acts of an individual shareholder may become the act of the corporation, and the distinction between the corporation and the principal shareholder will be disregarded.[56] This doctrine of alter ego will apply "where the corporate existence is used to do wrong, perpetrate fraud, or commit a crime" and "in cases where the facts require the court to disregard separate existence of the corporation and shareholders in order to protect rights of third persons and accomplish justice."[57] Application of the doctrine to this case will require a showing that 1) Sunshine was a "mere instrumentality" of Debtor; and 2) Debtor used Sunshine as part of a "design or scheme to perpetrate a fraud" or other circumstances require the Court to "protect the rights of third persons" or "accomplish justice."[58] Under Oklahoma law, as found by the Court of Appeals for the Tenth Circuit, a corporation may be

---

[54] *Fanning v. Brown*, 2004 OK 7, ¶ 16, 85 P.3d 841, 846-47.

[55] *Kenkel v. Parker*, 2015 OK 81, ¶12, 362 P.3d 1145, 1149.  *See also Floyd v. I.R.S.*, 151 F.3d 1295, 1298 (10th Cir. 1998) (Courts define the "standard" veil-piercing situation as one "in which corporate creditors seek to disregard the corporate form in order to hold stockholder assets liable for the corporation's debts."); *Bankers Tr. Co. v. Lee Keeling & Assocs., Inc*., No. 87-C-20, 1992 WL 602830, at *1 (N.D. Okla. Nov. 2, 1992) ("The alter ego doctrine allows the Plaintiff 'to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation.' In the classic pattern of an alter ego claim the plaintiff attempts to pierce the corporate veil of a defendant. The objective is to reach the assets of the shareholder(s) of a corporate defendant." (citations omitted)), *aff'd*, 20 F.3d 1092 (10th Cir. 1994).

[56] *Sautbine v. Keller*, 1966 OK 209, ¶ 15, 423 P.2d 447, 451.

[57] *Id. See also Kenkel v. Parker*, 2015 OK at ¶ 12, 362 P.3d at 1149 (the corporate veil will not be pierced "[u]nless it can be shown that there is a design or scheme to perpetrate a fraud or defeat public convenience, justify wrong, or defend crime."); *Robertson v. Roy L. Morgan Prod. Co.*, 411 F.2d 1041, 1043 (10th Cir. 1969) ("Oklahoma permits the court to disregard the corporate entity if used, (1) to defeat public convenience, (2) justify wrong, (3) to perpetrate fraud whether actual or implied, or (4) to defend crime." (citing *Sautbine*)); *In re Estate of Rahill*, 1991 OK CIV APP 83, ¶ 8, 827 P.2d 896, 897 (same).

[58] *Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1018 (10th Cir. 1990); *Mid-Continent Life Ins. Co. v. Goforth*, 1943 OK 244, ¶ 10, 143 P.2d 154, 157.

deemed to be a mere instrumentality of an individual if 1) the corporation is undercapitalized; 2) it is without separate books; 3) its finances are not kept separate from individual finances, e.g., individual obligations are paid by the corporation or vice versa; 4) corporate formalities are not followed; or 5) the corporation is merely a sham.[59] These factors are neither exclusive nor exhaustive, but merely intended to provide guidance to courts in determining the level of control exerted by the individual.[60]  While the goal in piercing the corporate veil is to impute liability for the acts of the corporation to the responsible persons, it is an extraordinary remedy that should be used sparingly.[61]

Claimants presented no evidence that Sunshine was undercapitalized. Debtor testified that he did not personally contribute capital to Sunshine in exchange for his shares. Beyond Claimants testimony of their capital contributions, there was no evidence of the financial status of Sunshine.[62] There is no allegation that Sunshine did not keep separate books as required under Oklahoma law. There was no evidence submitted that Debtor commingled his finances with those of Sunshine, or that he regularly used Sunshine to pay his personal obligations or vice versa.[63] Lastly, there was

---

[59] *Home-Stake Prod.*, 907 F.2d at 1018. *See also Mattingly L. Firm, P.C. v. Henson*, 2020 OK CIV APP 19, ¶ 17, 466 P.3d 590, 595 (applying analysis to LLC as alter ego of member under Oklahoma law).

[60] *Mattingly L. Firm*, 2020 OK CIV APP at ¶ 17, 466 P.3d at 595.

[61] *Puckett v. Cornelson*, 1995 OK CIV APP 72, ¶ 6, 897 P.2d 1154, 1156.

[62] Claimants allege they are unable to provide financial information of Sunshine because Debtor and/or Sunshine have refused to answer interrogatories or document requests in the State Court Action. Claimants do not appear to have made any effort to conduct discovery in this matter, nor do they argue that they were impeded from doing so.

[63] Turner testified to his "belief" that Sunshine made payments for a car belonging to Debtor.  No evidence was presented of such an arrangement, including whether Debtor used a car owned or financed by Sunshine, or whether Sunshine reimbursed Debtor for business use of a private vehicle.  This testimony was characteristic of the vague allegations raised by Claimants throughout the Hearing. Such allegations fall far short of the evidentiary standards required to establish a claim and hold Debtor liable under § 502(b).

no allegation that Sunshine, as incorporated and operated, was a sham entity, indistinguishable from Debtor personally.

Claimants make several allegations regarding Debtor's operation of Sunshine.  They allege Debtor had the Bylaws drafted in a way that benefitted himself as the majority shareholder. He does not deny this allegation. Claimants presented no argument or case law to suggest that any specific provision in the Bylaws was unlawful or should be found contrary to public policy.[64] They do not indicate why, if they held objections to the Bylaws, they failed to raise those at the time they acquired their shares in Sunshine. Claimants allege that Debtor violated the Bylaws when he authorized a salary increase on his own behalf, despite a provision that only the Board had such authority.  To the extent Debtor violated the Bylaws of Sunshine, Sunshine may have a cause of action against him.  There is no evidence that either Sunshine or Claimants attempted to initiate such an action, either directly or derivatively.  While it appears Debtor may have violated some duty to Sunshine in authorizing his own salary increase, the Court does not find that this single event rises to the level required to find that Debtor exercised excessive control over Sunshine.

Claimants protest that Debtor made all operational decisions for Sunshine, including employment of personnel, suggesting that he operated the business for his own benefit and to the detriment of Claimants.  It appears Debtor was the President and CEO of Sunshine at all relevant times during its operation.  Although Claimants decry Debtor's level of control over the operations of Sunshine, they do not indicate how his operational control went beyond the ordinary scope of his roles as CEO and President of Sunshine.

---

[64] *See* Okla. Stat. tit. 18, § 1013(B) ("The bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its shareholders, directors, officers or employees.").

Claimants allege Debtor gave shares of Sunshine to his son, Forrest, for no consideration, which they see as evidence of Debtor's disregard of corporate formalities.  Claimants presented no evidence of the gift, including whether the shares came from Debtor's shares or were newly issued. Available evidence shows that as of May 24, 2017, when Marti acquired his 34.9% ownership in Sunshine, Forrest was not a shareholder of Sunshine.[65] On July 10, 2017, when Marti acquired an additional 5% ownership stake in Sunshine, he was aware that Forrest held a 10% ownership stake in the company.[66]   The other Claimants received their shares in Sunshine subsequent to Forrest becoming a shareholder. Therefore, each Claimant either received or voluntarily increased their ownership in Sunshine with full knowledge that Debtor and his son held a majority interest in Sunshine. None of the Claimants can now claim surprise or unfairness.

Claimants further allege Debtor ignored corporate formalities by failing to give them notice of Board meetings and actions, and by failing to respond to their demands to hold such meetings. This allegation ignores the fact that Debtor, along with Forrest, as majority shareholders of Sunshine, had taken corporate action to remove each of the Claimants from the Board.  Whether such removal was lawful was the subject of the State Court Action.[67]  Based on exhibits attached to the Amended Verified Petition in the State Court Action, the actions taken by Sunshine were meticulously documented and recorded as records of the corporation.[68] While Claimants may well have claims against Sunshine regarding their removal from the Board or failure to receive notice of its corporate actions, there is no credible evidence corporate formalities were not adhered to.

---

[65] Claimants' Ex. 26.
[66] Claimants' Ex. 27.
[67] *See* Claimants' Ex. 9.
[68] *See id.*

Claimants allege, and Debtor admits, that Sunshine never issued share certificates, even though such action was required by its Bylaws.[69] Claimants do not assert specific damages related to this lapse. The absence of share certificates has not prevented shareholders from transferring their shares, as evidenced by the sale of shares from Houchin to Marti.[70] There has been no allegation that Sunshine failed to keep adequate records of the relative ownership of each shareholder. The Court agrees that the failure to issue share certificates is a violation of the Bylaws, but the lapse appears to be that of Sunshine, which must be raised in a derivative action against the corporation.

Claimants presented evidence that on several occasions, Debtor received payments directly from First Care for work Marti felt should have been performed by and through Sunshine.[71] The territory license agreement between Sunshine and First Care included a provision for employment of Debtor as an independent contractor for certain services performed in addition to the services promised by Sunshine.[72] Debtor testified that any payments he received directly from First Care were the result of services performed in his capacity as an independent contractor under this provision. Likewise, Debtor received $25,000 in his personal capacity directly from Cole in exchange for the sale of his personal shares in an entity called Sunshine Care Medical Group. No evidence was provided that this was a fraudulent transaction or in any way related to Debtor's operation of Sunshine. Based on the evidence, the Court concludes that any payments received by Debtor from Claimants were the result of contracts between the parties, and not the result of Debtor's manipulation of resources owed to Sunshine.

---

[69] *See* Claimants' Ex. 7-12.
[70] *See* Claimants' Ex. 28.
[71] *See, e.g.*, Claimants' Ex. 24 (invoice from Debtor, as an individual, to First Care); Claimants' Ex. 25 (bank statements of First Care).
[72] *See, e.g.*, Claimants' Ex. 21 at 21-12 ¶ 11 & 21-19.

Claimants cite the incorporation of Sunshine Florida as evidence that Debtor plans to continue the business of Sunshine without notice to and "in usurpation of the rights and interests" of Claimants.[73] Beyond the fact that Debtor is involved with the incorporation of Sunshine Florida and that it has a name and business purpose similar to Sunshine, Claimants presented no evidence that Debtor has taken or intends to take inappropriate action with respect to Sunshine Florida.  At this time, any allegations of malfeasance on Debtor's part are based on speculation and innuendo.

Claimants allege Debtor improperly used Sunshine to institute the State Court Action with the intention of harming them and ultimately wearing them down until they gave up their shares in Sunshine. They portray Debtor's statements to that effect to Bill Turner as an "admission" of his malignant intent and bad faith with regard to the State Court Action.  Additionally, Claimants allege Debtor used his wiles to procure Houchin to represent Sunshine in the State Court Action, effectively prolonging the litigation and causing them to incur additional legal fees.  On this basis, Claimants assert that Debtor, not Sunshine or other defendants named in the State Court Action, should be held liable for their attorney fees generated in that case.

The Court is aware of the acrimonious relationship that has developed between Debtor and Claimants. In the heat of contested litigation, parties may say things that portray them in a poor light. Likewise, Debtor predictably preferred to see the Sunshine matter settled in his favor than to endure drawn out and risky litigation. The Court does not see Debtor's outburst to Bill Turner, who at the time was a trusted employee, as the devious smoking gun admission that Claimants suggest. Nor does the Court agree with Claimants' characterization of Houchin's involvement in the State Court Action.  Houchin testified that he voluntarily made an appearance in the State Court Action at Debtor's suggestion. Houchin testified that he is not being paid or controlled or otherwise

---

[73] *See* ECF Nos. 59, at 4 ¶14; 60, at 4 ¶14 & 61, at 4 ¶14.

manipulated by Debtor.  Having entered the case of behalf of Sunshine, Houchin now feels compelled by state ethics rules to remain and provide his client with a basic defense.  While this is clearly irksome to Claimants, the Court cannot see how it can be blamed on or otherwise tied to Debtor.

Based on the evidence presented by Claimants, the Court cannot find they have met their burden to show Sunshine should be recognized as the alter ego of Debtor.

First, they have not shown that Sunshine is a mere instrumentality of Debtor.  Claimants made no allegations that Sunshine was undercapitalized or failed to keep separate books.  To the extent they claim Debtor personally received funds intended for Sunshine, the Court finds those arrangements were consistent with the contracts between the parties. The Court finds no evidence corporate formalities were not followed, or if they were not, such actions were de minimus and not sufficient to pierce the corporate veil.  Likewise, there is no evidence that Sunshine was a shell or sham used by Debtor to conduct illegal or fraudulent activity.

Second, they have not shown Debtor used Sunshine as part of "a design or scheme to perpetrate a fraud."  Debtor admits that he organized Sunshine so he would maintain control over its operations as the majority shareholder. Each of the Claimants were aware of that arrangement when they made significant investments in Sunshine. While Claimants now complain that they do not like the way Debtor has operated Sunshine, they have presented no evidence that he exerted control beyond that of a majority shareholder.  Such control cannot be seen as fraud.

Lastly, Claimants have not shown piercing the corporate veil of Sunshine is necessary to protect their rights as shareholders or to accomplish justice.[74] Each of the Claimants feels they made substantial investments of both time and money in Sunshine, for which they have seen no

---

[74] *See Goforth*, 1943 OK at ¶ 10, 143 P.2d at 157.

return.   Sunshine itself now appears to be insolvent, and in their hunt for someone to blame,
Claimants have set their sights on Debtor. Despite allegations of malfeasance in his operation of
Sunshine, Claimants have not presented evidence that his actions exceeded the legal boundaries of
control as a corporate officer, director, or majority shareholder. The Court concludes that Claimants
have not met their burden of proof to show Debtor should be held liable for the debts of Sunshine.

### 2.  Derivative injury rule

Claimants allege that

> Debtor incurred debts in the name of the corporation in the amount of
> $1,378,271.30, as outlined in subject Claim, which debts have not been repaid and
> for which Debtor has not accounted, such funds appearing to have been spent or
> otherwise wasted to detriment of Creditor as a shareholder. Debtor has not disclosed
> the nature or purpose of such debts, especially any need or use of borrowed funds.
> The debts were incurred while Debtor controlled the corporation and after he barred
> Creditor and others from or has been damaged by apparent resulting insolvency of
> the corporation caused by acts of Debtor, and has received no return on
> investment.[75]

At the Hearing, counsel for Claimants explained the Attachments included debts from Debtor's
bankruptcy schedules because they were incurred in the name of Sunshine. Claimants believe these
debts were incurred by Debtor in his role as an officer or director of Sunshine, and that such action
has reduced the value of their shares in Sunshine. Furthermore, they argue that Debtor has never
explained what happened to the funds associated with these debts.

"The derivative injury rule holds that a shareholder . . . may not sue for personal injuries
that result directly from injuries to the corporation."[76]  In Oklahoma,

> it is a well-established general rule that a stockholder of a corporation has no
> personal or individual right of action against third persons, including officers and
> directors of the corporation, for a wrong or injury to the corporation which results
> in the destruction or depreciation of the value of his stock, *since the wrong thus*

---

[75] *See, e.g.*, ECF No. 59, at 3 ¶13.

[76] *In re SemCrude L.P.*, 796 F.3d 310, 316 (3d Cir. 2015) (quoting *In re Kaplan,* 143 F.3d
807, 811–12 (3d Cir. 1998)).

*suffered by the stockholder is merely incidental to the wrong suffered by the corporation and affects all stockholders alike.*[77]

In *Dobry v. Yukon Electric Co.*, the Supreme Court of Oklahoma found that a stockholder in a corporation has no remedy at law for recovery of damages suffered by reason of the wrongful acts of directors that result in direct injury to the corporation and only consequential injury to the stockholder, either by depriving them of dividends which they might otherwise have received or by depressing the value of their stock.[78]  As such, the only remedy of such a stockholder was through a derivative action, brought on behalf of the corporation.[79]  An exception to the general rule exists where a plaintiff alleges loss personally owing from the director in addition to the loss to the corporation.[80]

Claimants' grievances appear to be isolated to holding Debtor responsible for the reduction in the value of their shares as shareholders of Sunshine.  They have not made any allegation, either in the Contested Claims, Responses, or at the Hearing, that they have any personal stake or connection to the various debts listed on the Attachments, which they believe Debtor improperly incurred in the name of Sunshine.  If the gravamen of their claim is the reduction in the value of Sunshine as a result of Debtor's alleged misconduct, then that claim belongs to Sunshine, not Claimants. Each of the Contested Claims were brought directly in the names of the individual Claimants, and cannot be interpreted to state a claim on behalf of Sunshine.  As such, the Court

---

[77] *Id*. at 317 (quoting *Dobry v. Yukon Elec. Co.*, 1955 OK 281, ¶ 8, 290 P.2d 135, 137) (emphasis added by court in *In re Semcrude*)).

[78] *Dobry*, 1955 OK at ¶ 5-6; 290 P.2d at 137. *See also In re SemCrude*, 796 F.3d at 318 ("'It is well settled that an injury done to the stock and capital of a corporation by the negligence or misfeasance of its officers and directors is an injury done to the whole body of stockholders in common, and not an injury for which a single stockholder can sue.'" (quoting *Stuart v. Robertson*, 118 Okla. 259, 248 P. 617 (1926))).

[79] *Dobry*, 1955 OK at ¶ 16; 290 P.2d at 137.

[80] *See id.*; *In re SemCrude*, 796 F.3d at 317.

finds that Claimants have not stated or proven any right to recovery from Debtor related to the debts of Sunshine listed in his schedules.

   *E.  Debtor did not properly raise issue of sanctions under Rule 9011.*

   At the Hearing, counsel for Debtor suggested that each of the Contested Claims was blatantly deficient its face, both for failure to state any claim against Debtor and failure to attach any supporting documents, and that Claimants and their counsel should be sanctioned under Rule 9011 of the Federal Rules of Bankruptcy Procedure.  While the Court may have entertained such a motion had it been properly made, the Court is unwilling to step into the breach when a party has not availed itself of the tools at hand.  Rule 9011(c) allows a party to seek court assistance and sanctions when it feels its adversary has presented a specious claim or made factual contentions without sufficient evidentiary support. But first, that party must use the "self-help" tools found in Rule 9011(c)(2)(A) and (B), which require formal service of a motion and an opportunity for the offending party to withdraw or amend the offensive claim or pleading of its own volition. Debtor did not take advantage of these available tools and, as a result, is not entitled to an award of sanctions in this matter.

### Conclusion

   Debtor's objections are sustained.  Claim Nos. 12, 13, 14, filed by Claimants Marti, Turner, and Cole, are disallowed. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

   Dated this 10th day of November, 2025.

BY THE COURT:

PAUL R. THOMAS, CHIEF JUDGE
UNITED STATES BANKRUPTCY